UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MILENA MOSQUERA,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | Civil Action No.: 12-1898 (ES)<br><br>**OPINION** |

**SALAS, DISTRICT JUDGE**

Before the Court is an appeal filed by Milena Mosquera ("Plaintiff") seeking review of the Administrative Law Judge's ("ALJ") decision denying Plaintiff's application for social security income disability benefits under Title II and supplemental social security income disability benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85. The Court has considered the submissions in support of and in opposition to the present appeal, (D.E. No. 8), in addition to the administrative record, and decides the matter without oral argument pursuant to Fed. R. Civ. P. 78(b). The Court has subject matter jurisdiction pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, the Court affirms the Commissioner of Social Security's ("Commissioner") decision.

**I.     Background**

On March 18, 2009, Plaintiff filed a Title II application for disability insurance benefits, alleging disability commencing January 27, 2009. (R. at 16, 172-74).[1] On May 21, 2009, Plaintiff also filed a Title XVI application for supplemental security income, alleging disability

---

[1] The Court uses the initial "R." to refer to the Administrative Record.

1

commencing January 27, 2009. (R. at 16, 55). Plaintiff complained of pain in her hands, wrists, arms, back, and neck. (R. at 18-19). Both claims were initially denied on September 17, 2009. (R. at 16, 55-58). On December 15, 2009, Plaintiff filed a written request for a hearing. (R. at 76-77). The hearing request was granted and Plaintiff appeared before ALJ Leonard Olarsch on August 3, 2010. (R. at 30).

At the time of the hearing, Plaintiff was forty-six years old and completed twelve grades of school in Colombia, South America, with no other vocational training. (R. at 33-34). Plaintiff left Colombia and came to the United States in 1984. (R. at 34). Plaintiff was unable to communicate in English at the hearing. (R. at 23). Plaintiff's last job, where she had worked for nineteen years until January 27, 2009, was as a packer of steel products that required lifting steel blades and power tools that weighed as much as sixty pounds. (R. at 23, 38, 46-50).

Plaintiff alleged at the hearing that she has severe hand pain that prevents her from lifting even a cup. (R. at 45). Because of this pain, Plaintiff does not wash dishes, sweep, mop, or vacuum. (R. at 43). However, Plaintiff separates clothes for the laundry, goes grocery shopping with her family, and attends church every Sunday. (R. at 43-44). Plaintiff can also write with a pen. (R. at 45). Plaintiff complains of neck pain and alleges that she received three injections in her buttocks to alleviate this neck pain. (R. at 41). Plaintiff also alleges that she feels depressed. (R. at 40).

A. **History of Medical Treatment**

Plaintiff has a history of medical treatment for pain in her hands, wrists, neck, and back. On August 23, 2006, Dr. Eric D. Freeman ("Dr. Freeman") performed an electrodiagnostic evaluation on Plaintiff, who complained of bilateral hand numbness from a work-related incident. (R. at 338-39). Dr. Freeman found that there was nerve entrapment at the wrist

"suggestive of carpal tunnel syndrome moderate in nature," but found "[n]o evidence of cervical radiculopathy, plexopathy, peripheral neuropathy, or motor neuron disease." (R. at 339). On September 6, 2006, Dr. Robert J. Bercik ("Dr. Bercik"), an orthopaedic surgeon, performed an initial orthopaedic consultation on Plaintiff and diagnosed Plaintiff with bilateral carpal tunnel syndrome, recommending surgery for both wrists. (R. at 186-87). Plaintiff agreed to have surgery on her right wrist, and Dr. Bercik recommended that Plaintiff only continue with light work until her wrists improved. (R. at 187). On October 23, 2006, Dr. Ross Fox ("Dr. Fox") performed carpal tunnel release surgery on Plaintiff's right wrist. (R. at 188). Dr. Fox performed this same surgery on Plaintiff's left wrist on December 11, 2006. (R. at 225-27).

Plaintiff claims that after these surgeries she experienced cervical pain that radiated into the left brachium down through her hand. (R. at 263). As a result, Plaintiff attended ten physical therapy sessions from January 31, 2007 to February 23, 2007. (R. at 265). At the end of these sessions, Plaintiff alleges that her symptoms remained unchanged, but Timothy O'Kay, the physical therapist, found that Plaintiff's left shoulder and cervical range of motion were "within functional limits." (*Id.*).

On March 27, 2007, Dr. John E. Robinton ("Dr. Robinton"), a neurologist, evaluated Plaintiff's complaints of pain in her left neck, upper back, shoulder, wrist, and hand. (R. at 266-67). Dr. Robinton reported that Plaintiff had "mild left paravertebral tenderness," but concluded that Plaintiff's electromyography ("EMG") report was "completely normal," that there was "no objective evidence . . . to indicate that [Plaintiff's] ongoing complaints indicate a radiculopathy, plexopathy, or neuropathic process," and that she had reached "maximal medical improvement." (R. at 266-67, 297). On December 10, 2008, Dr. Robinton reevaluated Plaintiff and found "no motor or sensory deficit" while EMG and nerve conduction studies were "totally normal." (R. at

3

294). While Dr. Robinton noted that Plaintiff still complained of pain, he found no objective evidence of dysfunction. (*Id.*).

On December 23, 2008, Dr. Fox found that Plaintiff's wrist pain was "seemingly consistent with de Quervain's tenosynovitis" after physical examination. (R. at 421). On January 28, 2009, Dr. Fox performed first dorsal compartment release surgery on Plaintiff's right wrist to alleviate Plaintiff's de Quervain's tenosynovitis. (R. at 365-66). On February 10, 2009, Dr. Fox determined that Plaintiff's "post right de Quervain's release" was doing well, but found that Plaintiff demonstrated a locking right thumb on her right hand, a symptom of trigger thumb. (R. at 417). On March 31, 2009, Dr. Freeman also examined Plaintiff's post-surgery status and found that Plaintiff had "bilateral hand pain secondary to median nerve entrapment at the wrist" as well as "post right de Quervain's tendinitis release," but found "no subjective or objective evidence of complex regional pain syndrome/RSD [reflex sympathetic dystrophy] in the bilateral upper extremities." (R. at 336-37). Dr. Freeman concluded that Plaintiff can "certainly work at a light duty status . . . ." (R. at 337). On June 3, 2009, Dr. Fox performed surgery on Plaintiff to alleviate her right trigger thumb. (R. at 344-45). On July 21, 2009 and August 18, 2009, Plaintiff met with Dr. Fox and reported that her right thumb no longer locks, but she complained of pain in both upper extremities. (R. at 407, 409). Dr. Fox explained to Plaintiff that because the surgeries did not alleviate Plaintiff's pain in her right hand, further surgeries on the left hand would not be fruitful and may only make her symptoms worse. (R. at 407). Dr. Fox suggested that Plaintiff return to light duty work. (R. at 407, 409).

On September 21, 2009, Dr. Francisco Munoz ("Dr. Munoz"), one of Plaintiff's treating physicians, referred Plaintiff to Dr. Michael L. Sananman ("Dr. Sananman"), who performed a neurological examination of Plaintiff. (R. at 483-84). Dr. Sananman found that she had right-

sided T6-7 herpes zoster, cervical strain, and status post carpal tunnel surgery bilaterally, but noted that the "pain syndrome in the neck, chest and hands seems to be well controlled on medication." (R. at 484). On April 30, 2010, an MRI ordered by Dr. Munoz found that Plaintiff had some degenerative changes in the cervical spine resulting in mild flattening of the thecal sac at three levels of the spine and mild right foraminal narrowing at two levels of the spine. (R. at 517-18). On July 28, 2010, Dr. Munoz noted tenderness along Plaintiff's cervical and upper thoracic spine. (R. at 515). On July 30, 2010, Dr. Munoz explained that the reason for Plaintiff's unemployment was because of her benign hypertension, cervicalgia, osteoarthrosis, sciatica, and depression. (R. at 520).

### B. Mental Evaluation

Plaintiff also underwent evaluations to investigate possible mental impairments. On August 13, 2009, the New Jersey Division of Disability Services referred Plaintiff to Dr. Ernesto Perdoma ("Dr. Perdoma"), a licensed psychologist, for a psychological evaluation. (R. at 403-06). At this evaluation, Plaintiff "reported feelings of sadness, frustration, crying spells, lack of interest, lack of motivation, no desire, poor appetite, irritability and difficulty sleeping." (R. at 404). Dr. Perdoma found that Plaintiff was oriented to time, place, and person and did not suffer from a thought disorder or psychosis. (*Id.*). Plaintiff's affect was "unremarkable, full and appropriate for the evaluation session . . . ." (*Id.*). Plaintiff's short-term memory was fair and her long-term memory and concentration was good. (R. at 405). Dr. Perdoma concluded that Plaintiff had a Global Assessment of Functioning ("GAF") of 70, indicating "moderate symptoms," and that her depression would increase her disability.[2] (R. at 405-06). On September 17, 2009, Dr. Amy Brams ("Dr. Brams"), a psychological consultant for the State,

---

[2] As noted in the ALJ's opinion, Dr. Perdoma mistakenly attributed a GAF of 70 to indicate moderate symptoms, when in fact a GAF of that number only indicates "some mild symptoms." Am. Psychiatry Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000); (R. at 23).

5

found that Plaintiff's mental disposition was not severe. (R. at 473). Dr. Brams found that Plaintiff's mental impairment would only mildly restrict Plaintiff's activities of daily living, Plaintiff's difficulties in maintaining social functions, and Plaintiff's difficulties in maintaining concentration, persistence, or pace. (R. at 475).

      **C.**      **Functional Capacity Evaluations**

Plaintiff had two functional capacity evaluations to specifically determine her residual functional capacity ("RFC"). On August 4, 2009, Kinematic Consultants, Inc. ("Kinematic Consultants") evaluated Plaintiff's RFC and found that Plaintiff's recommended maximum work capacity is light work at minimum. (R. at 401). They found Plaintiff was able to lift up to twenty pounds to her waist occasionally,[3] up to ten pounds to her waist frequently,[4] and up to three pounds to her waist constantly.[5] (R. at 400). They concluded that Plaintiff "demonstrate[d] ability for operating machinery with push button/lever controls, packing small/light items, checking packed items versus invoice sheets, applying labels/closing boxes, entering information into computers, etc." (R. at 401). They did note that "[b]ased on mathematical standard deviation and coefficient of variation," it appeared that Plaintiff was not putting in her full effort on the examination, showing significant submaximal effort in strength and force protocols and mild submaximal effort in dynamic movement protocols. (R. at 400).

On August 6, 2009, Dr. David X. Schneider ("Dr. Schneider"), a medical consultant for the State, found that Plaintiff could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds. (R. at 466). Plaintiff could stand and/or walk with normal breaks for about six hours in an eight-hour workday. (*Id.*). Plaintiff could sit with normal breaks for a

---

[3] Occasionally is defined as none to one-third of the time during an eight-hour day for five days a week. (R. at 400).
[4] Frequently is defined as from one-third to two-thirds of the time during an eight-hour day for five days a week. (*Id.*).
[5] Constantly is defined as more than two-thirds of the time during an eight-hour day for five days a week. (*Id.*).

6

total of about six hours in an eight-hour workday. (*Id.*). Plaintiff's pushing and/or pulling abilities were limited in the upper extremities but not the lower extremities. (*Id.*). Plaintiff could climb ramps or stairs frequently and climb ladders, ropes, or scaffolds occasionally. (R. at 467). Plaintiff could balance, stoop, kneel, crouch, and crawl frequently. (*Id.*) Plaintiff had unlimited ability with reaching in all directions, fine manipulation fingering, and feeling. (R. at 468). Plaintiff had limited ability in gross handling. (*Id.*) Dr. Schneider wrote that she could only perform gross handling frequently, thus finding that Plaintiff had occasional limitations in gross handling. (*Id.*).

### D. The ALJ's Decision and Other Procedural History

At the hearing, the ALJ relied on a vocational expert ("VE") to make his decision. The VE opined about the availability of jobs regarding two hypothetical levels of impairment for the Plaintiff. If the Plaintiff had the ability to perform light work with occasional limitations in gross handling, Plaintiff would not be able to perform her past relevant work as a packer, but would be able to perform jobs in significant numbers in the labor market, such as a ticket taker or a folding machine operator. (R. at 50-51). If Plaintiff had the ability to perform light with frequent limitations in gross handling, there would not be any jobs in significant numbers for Plaintiff in the labor market. (R. at 52).

On September 14, 2010, ALJ Olarsch determined that Plaintiff had severe impairments from forearm injuries and degenerative disc disease in the cervical spine. (R. at 18). Despite these impairments, the ALJ adopted Dr. Schneider's functional capacity evaluation and found that Plaintiff could perform light work with occasional limitations in gross handling. (R. at 19). The VE found there were jobs in significant numbers in the national economy for this level of impairment. (R. at 50-51). Therefore, the ALJ denied Plaintiff's application, finding that she

was not disabled. (R. at 16-25). On October 21, 2010, Plaintiff filed a Request for Review from the Appeals Council, seeking review of the ALJ's opinion. (R. at 9). On February 8, 2012, the Appeals Council denied the appeal and informed Plaintiff that should she disagree with this decision, she may file a civil action. (R. at 1-3). On March 28, 2012, Plaintiff commenced the instant action in this Court.

## II. Legal Standard

### A. Standard of Review

The Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g). The Court must affirm the Commissioner's decision if it is "supported by substantial evidence." 42 U.S.C. § 405(g) (2012). Substantial evidence is "more than a mere scintilla" of evidence and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

In reviewing the ALJ's decision, where there is conflicting evidence, the Commissioner "must adequately explain his reasons in the record for rejecting or discrediting competent evidence." *Ogden v. Bowen*, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing *Brewster v. Heckler*, 786 F.2d 581 (3d Cir. 1986)). Also, the Court is bound by the ALJ's findings that are supported by substantial evidence "even if [it] would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1990). Thus, this Court is limited in its review because it cannot "weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992).

## B. Determining Social Security Benefits

To qualify for Social Security benefits, the plaintiff must first establish that she is "disabled." 42 U.S.C. § 1381 (2012). Because the term "disability" has essentially the same definition in both Title II and Title XVI programs, the law under Title II is applicable to a determination of disability under Title XVI. *See* 42 U.S.C. §§ 423(d) and 1382c(a)(3) (2012). "Under the Social Security Act, a disability is established where the [plaintiff] demonstrates that there is some medically determinable basis for an impairment that prevents [her] from engaging in any substantial gainful activity for a statutory twelve-month period." *Fargnoli v. Halter*, 247 F.3d 34, 38-39 (3d Cir. 2001) (internal citations and quotations omitted). A plaintiff is disabled for these purposes only if her physical or mental impairments are "of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A physical or mental impairment is an "impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42. U.S.C. § 423(d)(3).

The Social Security Administration has established the following five-step, sequential evaluation process to determine whether an individual is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. . . .

20 C.F.R. § 404.1520(a)(4) (2013).

### C. Burden of Proof

The five-step sequential evaluation process involves a shifting burden of proof. *See Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983). At step one, the plaintiff has the burden of establishing that she has not engaged in "substantial gainful activity" since the onset `of the alleged disability and at step two that she suffers from a "severe impairment" or "combination of impairments." 20 C.F.R. § 404.1520(a)-(c). If the plaintiff is able to demonstrate both that she has not engaged in substantial gainful activity and that she suffers from a severe impairment, the plaintiff must then demonstrate—at step three—that her impairments are equal to or exceed one of the impairments listed in appendix 1 of the regulations. 20 C.F.R. § 404.1520(d). If she is able to make this showing then she is presumed disabled. 20 C.F.R. § 404.1520(a)(4)(iii). If she cannot show that she meets or exceeds a listed impairment, at step four she must show that her RFC does not permit her to return to her previous work. 20 C.F.R. § 404.1520(e)-(f). If the plaintiff meets this burden, then at step five, the burden shifts to the Commissioner to demonstrate that the plaintiff can make an adjustment

to other work. 20 C.F.R. § 404.1520(g); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). If the Commissioner cannot show that the plaintiff can make an adjustment to other work, the plaintiff will be found disabled. 20 C.F.R. § 404.1520(a)(4)(i).

### III. Discussion

On appeal, Plaintiff argues that the Commissioner erred as a matter of law in determining that Plaintiff has the RFC to perform light work with occasional limitations in gross handling. (D.E. No. 8, Brief in Support of Plaintiff Milena Mosquera ("Pl.'s Br.") 11). Plaintiff specifically argues that the ALJ's RFC determination is not based on substantial evidence. (Pl.'s Br. 11-23). Plaintiff asks that the Court reverse the decision of the Commissioner and remand this case for a new decision. (*Id.*). Defendant argues that the ALJ based his decision on substantial evidence and correctly determined that Plaintiff's RFC. (R. at 9-19). The Court rejects Plaintiff's contention.

The Court finds that ALJ Olarsch correctly found that Plaintiff has the RFC to perform light work with occasional limitations in gross handling. Light work is defined as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. 404.1567(b) (2013).

Plaintiff argues that the ALJ's RFC finding of light work is not supported by substantial evidence within the record, particularly with Plaintiff's limitations regarding gross handling. (R. at 10-13). The ALJ, however, examined clinical and laboratory findings, the claimant's

testimony of day-to-day routine, and evidence of symptom magnification to correctly come up with the RFC of light work subject to occasional limitations regarding gross handling.

    A.    **Clinical and Laboratory Findings**

    i.    **Medical Recommendations Supporting the ALJ's Determination of Light Work Subject to Occasional Limitations Regarding Gross Handling**

Multiple clinical and laboratory findings considered by the ALJ indicate that Plaintiff could perform light work. On September 6, 2006, Dr. Bercik concluded his orthopaedic consultation by stating that Plaintiff should only continue on light work until her wrists improved. (R. at 187). On March 31, 2009, Dr. Freeman concluded that despite bilateral hand pain and post right de Quervain's tenosynovitis, Plaintiff could "certainly work at a light duty status . . . ." (R. at 336-37). On August 4, 2009, Kinematic Consultants concluded that Plaintiff could perform light work with occasional lifting of twenty pounds. (R. at 401). On July 21, 2009 and August 18, 2009, Dr. Fox adopted Kinematic Consultants' recommendation and suggested that Plaintiff return to light duty work. (R. at 407, 409).

While all of these medical sources recommend light work for Plaintiff, the ALJ fully adopted the opinion of Dr. Schneider, the State medical consultant. (R. at 22). Dr. Schneider found that Plaintiff had exertional limitations that matched the qualifications for light work. (R. at 466). Unlike previous recommendations, however, Dr. Schneider additionally found that Plaintiff had limited ability to perform gross handling. (R. at 468). Dr. Schneider stated that Plaintiff was able to perform gross handling frequently. (*Id.*). In other words, Plaintiff could perform light work with occasional limitations in gross handling. (R. at 19). The VE determined that there are jobs in significant numbers for an individual that can perform light work with occasional limitations in gross handling. (R. at 50-51). Based on Dr. Schneider's conclusions, as well as the other doctors' similar recommendations, there are many indications in the record

supporting that the ALJ correctly found Plaintiff capable of light work. In an attempt to undermine the credibility of such findings, Plaintiff claims that (1) the ALJ improperly relied on the opinions of medical consultants, (2) Dr. Schneider's omission of severe impairments makes the ALJ's judgment improper, and (3) the ALJ misconstrued the results of wrist surgeries. The Court takes issue with each of Plaintiff's claims.

### ii. The Propriety of the ALJ's Reliance on Evaluations Performed by Dr. Schneider and Kinematic Consultants

In an attempt to undermine the credibility of such findings, Plaintiff argues that the ALJ improperly relied on Dr. Schneider and Kinematic Consultants' evaluations, claiming that the former is a "'medical consultant' . . . of unknown specialty" and the latter is a group of medical consultants, not doctors. (Pl.'s Br. 14, 21). This argument lacks legal credibility. First, Dr. Schneider, whom the ALJ relied on most heavily, is a State agency medical consultant, and such consultants are considered "experts in the Social Security disability programs" and the ALJ is required "to consider their findings of fact about the nature and severity of an individual's impairment(s) . . . ." S.S.R. 96-6p (July 2, 1996). Second, while the services of Kinematic Consultants were not acquired by the State, it was Dr. Fox, Plaintiff's treating physician for wrist and hand pain, who requested and ultimately accepted their evaluation. (R. at 387, 407. 409). A treating physician who has known Plaintiff for many years should be given considerable weight because "the more knowledge a treating source has about [the Plaintiff's] impairment(s) the more weight [the Court] will give to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(ii) (2012). Therefore, the ALJ correctly considered both consulting evaluations in determining Plaintiff's RFC.

### iii. Dr. Schneider's Omission

Plaintiff also argues that Dr. Schneider's evaluation is not credible by claiming that Dr. Schneider was unaware of Plaintiff's degenerative disc disease in the cervical spine because he does not list this impairment in the first page of his evaluation.[6] (Pl.'s Br. 15). The ALJ did conclude that degenerative disc disease in the Plaintiff's cervical spine was a severe impairment. (R. at 18). The exclusion of this impairment from the top of the first page of the evaluation, however, is not enough to discredit Dr. Schneider's functional capacity assessment.

First, Dr. Schneider had access to Plaintiff's medical file when he "reviewed the evidence . . . concerning [Plaintiff's] physical capacity" and Plaintiff's surgical history. (R. at 22, 466). Second, there is no indication that this cervical pain would prevent Plaintiff from performing light work. The mere presence of a severe impairment is not enough to find Plaintiff disabled; the impairment must have "caused functional limitations that prevent the [plaintiff] from engaging in any substantial gainful activity." *Alexander v. Shalala*, 927 F. Supp. 785, 792 (D.N.J. 1995), *aff'd*, 85 F.3d 611 (3d Cir. 1996) (per curiam). On March 31, 2009, Dr. Freeman examined Plaintiff's cervical spine, finding full range of motion and no pertinent abnormal findings, and still concluded that Plaintiff could perform light work. (R. at 336-37). In a September 2009 neurological examination, Dr. Sananman diagnosed cervical strain, but also concluded that the "pain syndrome in the neck, chest and hands seems to be well controlled on medication." (R. at 484). While an April 2010 MRI of Plaintiff's cervical spine noted degenerative changes and small disc herniations at two levels, Dr. Munoz noted only tenderness along the cervical and thoracic spine in his examination of Plaintiff. (R. at 515-18). Third, even

---

[6] In crafting this argument, Plaintiff claims that the "entirety of the ALJ's RFC hangs on [Dr. Schneider's] opinion . . . ." (Pl.'s Br. 14). While the ALJ ultimately adopted Dr. Schneider's conclusions, the Court believes that Plaintiff's dramatic characterization that the entirety of the ALJ's decision rests on Dr. Schneider's evaluation is an overstatement. The ALJ examined the evidence in its totality while making his decision and even notes that Dr. Schneider's evaluation is "in harmony with the record as a whole." (R. at 22).

if the Court were to disregard Dr. Schneider's functional capacity evaluation for his failure to list degenerative disc disease in the cervical spine as an impairment, this opinion has already noted that many other clinical and laboratory findings would also recommend light work for the Plaintiff.

### iv. The Results of Plaintiff's Wrist Surgeries

Plaintiff further argues that Dr. Schneider's evaluation incorrectly construed the effects of Plaintiff's surgeries to her wrists. First, Plaintiff takes issue with Dr. Schneider's conclusion that Plaintiff's surgery for carpel tunnel syndrome on both wrists had excellent physiological results. (Pl.'s Br. 15). In terms of physiological results, Dr. Fox found that his surgeries were successful in treating Plaintiff's carpel tunnel syndrome. (R. at 429). On April 3, 2007, Dr. Fox wrote that Plaintiff's EMG results show that Plaintiff is "completely relieved after carpel tunnel release" and that Plaintiff "has reached Maximal Medical Improvement . . . ." (*Id.*). On November 25, 2008, Plaintiff returned to Dr. Fox complaining of wrist pain, but Dr. Fox found that an x-ray revealed "no wasting" and that "bilateral wrists and the right thumb CMC [carpometacarpal] joint are effectively within normal limits." (R. at 425).

Second, Plaintiff takes issue with Dr. Schneider's conclusion that there were "no objective abnormalities" after Plaintiff's surgery for de Quervain's tenosynovitis. (R. at 15-16). In January 2009, Dr. Fox performed surgery on Plaintiff's right wrist to correct de Quervain's tenosynovitis. (R. at 365-66). One week after the surgery, Dr. Fox found that Plaintiff was "doing well" and that there was no swelling, brisk digit range of motion and capillary refill, and intact sensation in the hand. (R. at 418). It is true that Dr. Schneider's report did not state that Plaintiff needed an additional surgery to correct her right trigger finger in June 2009. (R. at 344-45). This locking was eventually corrected through the surgery. (R. at 409). While Plaintiff

complained that surgery did not completely alleviate her pain, there is reasonable evidence to show that each surgery improved each specific diagnosis without objective abnormalities.

### B. Claimant's Testimony of Day-to-Day Routine and Evidence of Symptom Magnification

Plaintiff argues that the ALJ erred in determining from Plaintiff's testimony that she had "essential independence in activities of daily living," specifically noting that Plaintiff's complaints of pain do not warrant an RFC determination of light work. (Pl.'s Br. 16, quoting R. at 21). In determining the claimant's RFC, if the ALJ decides to "reject any evidence, medical or otherwise, he must provide reasons for the rejection to enable meaningful judicial review." *Harris v. Comm'r of Soc. Sec.*, No. 11-2961, 2012 U.S. Dist. LEXIS 140308, at *19 (D.N.J. Sept. 27, 2012) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 122 (3d Cir. 2000)). If there is contradictory evidence, "the ALJ must resolve the discrepancy and provide a full explanation to support that resolution." *Id.* (citing *Burnett*, 220 F.3d at 121-22).

A plaintiff's "assertions of pain must be given serious consideration . . . , even where those assertions are not fully confirmed by objective evidence." *Green v. Schweiker*, 749 F.2d 1066, 1070 (3d Cir. 1984) (quoting *Smith v. Califano*, 637 F.2d 968, 972 (3d Cir. 1981). Nevertheless, a plaintiff's "statements alone are not enough to establish that there is a physical or mental impairment." 20 C.F.R. 404.1528(a) (2013). In evaluating a plaintiff's complaints of pain, "[t]he ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment in light of medical findings and other evidence regarding the true extent of the pain alleged by the [plaintiff]." *LaCourt v. Bowen*, 678 F. Supp. 80, 83 (D.N.J. 1988) (internal quotation marks omitted). The district court has "decline[d] to substitute its own determination of credibility for that of the ALJ, given that the ALJ had the opportunity to

observe Plaintiff first-hand." *Marquez v. Astrue*, No. 10-0463, 2011 U.S. Dist. LEXIS 21711, at *25 (D.N.J. Mar. 4, 2011) (citing *Wier v. Heckler*, 734 F.2d 955, 962 (3d Cir. 1984)).

In considering Plaintiff's complaints of pain, the ALJ considered Plaintiff's testimony at the August 3, 2010 hearing. The ALJ recognized that Plaintiff's husband does most of the cleaning and laundry in the household and helps Plaintiff cook meals. (R. at 21, 43). The ALJ recognized Plaintiff's children carry the groceries to the cart when Plaintiff goes shopping. (*Id.*). The ALJ noted that Plaintiff reads, watches television, and goes to church every Sunday with her family. (R. at 21, 44).

In resolving any contradictions that might arise between Plaintiff's subjective complaints of pain and her RFC determination, the ALJ noted that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . [RFC] assessment." (R. at 20). Specifically, the ALJ noted that Kinematic Consultants found that Plaintiff performed strength and force protocols with significant submaximal effort and her dynamic movement protocols with mild submaximal effort. (R. at 22, 400). Kinematic Consultants' evaluation stated that Plaintiff "demonstrated significant sub-maximum effort" and that the "results are compatible with a strong symptom magnification component to the Examinee's complaints and/or a conscious . . . effort to portray work ability below actual ability."[7] (R. at 400). With this indication of submaximal effort, there is reasonable evidence to support the ALJ's assertion that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her pain are not entirely credible. (R. at 20); *see Marquez*, 2011 U.S. Dist. LEXIS at *25 (deferring to ALJ's decision regarding the credibility of

---

[7] In an effort to discredit Kinetic Consultants' finding of submaximal effort, Plaintiff argues that the kinematic wrist assessment "allow[ed] her only 27% of normal in the right wrist and 18% of normal in the left wrist." (Pl.'s Br. at 20). The Court believes that this is an inaccurate reading of the evaluation. Plaintiff's kinematic wrist assessment actually demonstrates that she has 27% residual dysfunction in her right wrist compared to a normal wrist and 18% residual dysfunction in her left wrist compared to a normal wrist. (R. at 396). Either way, Kinetic Consultants found that these percentages reflect submaximal effort. (*Id.*).

17

the intensity of Plaintiff's complaints when Plaintiff demonstrated moderate symptom magnification in a functional capacity evaluation); *Daniels v. Comm'r of Soc. Sec.*, No. 07-1735, 2008 U.S. Dist. LEXIS 32554, at *37-40 (D.N.J. Apr. 21, 2008) (diminishing the credibility of Plaintiff's complaints of back pain when Plaintiff reported symptom magnification).

Plaintiff claims she is perplexed as to how the ALJ can claim that he gave Plaintiff "reasonable benefit of the doubt" in making his RFC assessment when he "accused" Plaintiff of symptom magnification. (Pl.'s Br. 19). Yet, the ALJ complies with Kinematic Consultants' recommendation of light work despite results compatible with a conscious portrayal of lower-than-actual work ability. (R. at 22). In fact, despite this warning of symptom magnification, the ALJ ultimately adopts a more restrictive evaluation than Kinematic Consultants' by adding occasional limitations in gross handling to Plaintiff's RFC of light work. (*Id.*).

The ALJ also considered the medical records to support his determination to diminish the credibility of Plaintiff's subjective complaints of pain. (R. at 20, 407-18) The ALJ noted that after the Plaintiff's de Quervain's tenosynovitis surgery and right trigger thumb surgery, Dr. Fox only found objective evidence of "expected wound tenderness and mild swelling," despite Plaintiff's complaints of pain. (*Id.*). Dr. Fox also wrote that the "de Quervain's tenosynovitis was never objectively documented . . . [but] was diagnosed based upon symptoms and normal electrodiagnostic study findings." (R. at 20, 421-22). The ALJ pointed to Dr. Freeman's March 31, 2009 examination where he concluded that Plaintiff could perform light work and found "no subjective or objective evidence of complex regional pain syndrome/RSD [reflex sympathetic dystrophy] in the bilateral upper extremities." (R. at 20, 337). The ALJ also noted that while Dr. Munoz's diagnosed Plaintiff with cervical radiculopathy and cervicalgia, Dr. Munoz does not record electrodiagnostic findings or neurological signs to support the diagnosis. (R. at 21, 520).

To counter Dr. Munoz's diagnosis, the ALJ pointed to Dr. Robinton's March 27, 2007 EMG and nerve conduction study that found "no objective evidence . . . to indicate [Plaintiff's] ongoing complaints indicate a radiculopathy, plexopathy, or neuropathic process." (R. at 21, 297). The ALJ noted that Plaintiff's physical therapist found in 2007 that Plaintiff's left shoulder and cervical range of motion were "within functional limits." (R. at 21, 265). The ALJ noted Dr. Sananman's September 19, 2009 neurological evaluation that demonstrated a full range of motion for the neck and upper extremities as well as "no spasms in the neck or shoulder muscles." (R. at 21, 483-84).

By comparing Plaintiff's complaints of pain against the evidence of symptom magnification and other medical evidence, the ALJ correctly weighed the credibility of Plaintiff's subjective complaints of pain in determining Plaintiff's RFC.

## IV. Conclusion

For the foregoing reasons, the judgment of the ALJ is affirmed.

s/*Esther Salas*
Esther Salas, U.S.D.J.